# United States Court of Appeals
## For the First Circuit

Nos. 19-1490, 19-1602

UNITED NURSES & ALLIED PROFESSIONALS,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner,

JEANNETTE GEARY,

Intervenor.

PETITION FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD AND CROSS-PETITION FOR
ENFORCEMENT

Before

Kayatta, <u>Circuit Judge</u>,
Souter,<sup>*</sup> <u>Associate Justice</u>,
and Selya, <u>Circuit Judge</u>.

<u>Christopher Callaci</u> for petitioner, cross-respondent.
<u>Milakshmi V. Rajapakse</u>, Attorney, National Labor Relations Board, with whom <u>Julie Brock Broido</u>, Supervisory Attorney, <u>Peter B. Robb</u>, General Counsel, <u>Alice B. Stock</u>, Associate General Counsel, and <u>David Habenstreit</u>, Acting Deputy Associate General Counsel, were on brief, for respondent, cross-petitioner.
<u>Glenn M. Taubman</u>, with whom <u>Aaron B. Solem</u> and <u>National Right to Work Legal Defense Foundation, Inc.</u> were on brief, for intervenor.

---

<sup>*</sup> Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

September 15, 2020

**KAYATTA**, **Circuit Judge**.  United Nurses and Allied Professionals ("the Union") is the exclusive bargaining representative of nurses and other employees at the Rhode Island hospital where Jeanette Geary works as a nurse.  Geary, who is no longer a member of the Union, has challenged the Union's decision to charge her for some of its 2009 lobbying expenses and to refuse her a letter verifying that its expenses were examined by an independent auditor.  The National Labor Relations Board ("the Board") agreed with Geary, ruling that lobbying expenses are categorically not chargeable to objecting employees and requiring the Union to provide Geary with an audit verification letter.  The Union petitioned for review of the decision.  For the following reasons, we deny the petition and grant the cross-petition for enforcement of the challenged order.

## I.

The Union is a group of fifteen local unions in Rhode Island, Vermont, and Connecticut.  One of the hospitals for which the Union is nurses' exclusive bargaining representative is an acute-care hospital in Warwick, Rhode Island.  In late September 2009, Jeannette Geary and others at that hospital resigned membership in the Union and objected to dues for activities they claimed were unrelated to collective bargaining, contract administration, or grievance adjustment.  The Union lowered the objectors' fees but still required them to contribute to covering

- 3 -

expenses for lobbying for several bills in the Vermont and Rhode Island legislatures. The Union reported in writing that its expenses had been verified by an independent auditor, but the Union declined to provide a verification letter from the auditor. Geary brought her complaint to the Board.

## II.

### A.

The primary issue in this proceeding is whether the Union's lobbying expenses are properly chargeable to the dissenting nurses. The Board determined that the dissenting nurses should not have to pay for any of the Union's lobbying expenses, reasoning that "relevant Supreme Court and lower court precedent compel[led] holding [that] lobbying costs are not chargeable as incurred during the union's performance of statutory duties as the objectors' exclusive bargaining agent." United Nurses and Allied Professionals (Kent Hospital), 367 N.L.R.B. No. 94, at *7 (2019). The Union contends that the Supreme Court has never adopted such a bright-line rule in interpreting the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. §§ 151-69, and asks us to overturn the Board's decision.

When presented with the Board's rational choice between two reasonable interpretations of the NLRA, we defer to the Board's chosen interpretation. See Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 42 (1987) ("If the Board adopts a rule that is

- 4 -

rational and consistent with the Act, then the rule is entitled to deference from the courts." (citations omitted)).  In this case, though, the Board has made no claim to have brought to bear its authority and expertise to resolve an ambiguous law.  Rather, it determined that it had no choice in the matter because both Supreme Court and lower court precedent "compel[led]" the Board to rule as it did, obviating, for example, any need for the Board to explain prior agency decisions arguably contrary to the rule applied in this case.[1]  As we have previously explained, we are "not obligated to defer to an agency's interpretation of Supreme Court precedent." NLRB v. U.S. Postal Serv., 660 F.3d 65, 68 (1st Cir. 2011) (quoting N.Y., N.Y., LLC v. NLRB, 313 F.3d 585, 590 (D.C. Cir. 2002)).  We therefore conduct de novo our own review of the precedent that the Board found compelling.  See id.

The core principles at play here come from Communications Workers v. Beck, in which the Supreme Court clarified that employees have the right to refuse to pay union fees for activities other than those "necessary to '[the union's performance of] the duties of an exclusive representative of the

---

[1]  Cf. Transport Workers, 329 N.L.R.B. 543, 544–45 (1999) (finding chargeable certain activities involving communication with government entities, including telephone calls and other conversations with Air Force and NASA Labor Relations personnel about working conditions and other representation issues, where the employer was a contractor and the employees were contracted to work at the Air Force or NASA).

employees in dealing with the employer on labor-management issues.'" 487 U.S. 735, 762–63 (1988) (quoting <u>Ellis</u> v. <u>Bhd. of Ry., Airline & S.S. Clerks</u>, 466 U.S. 435, 448 (1984) (evaluating a parallel provision of the Railway Labor Act)); <u>see also</u> <u>id.</u> at 745 (asking whether charges are permitted for "activities beyond those germane to collective bargaining, contract administration, and grievance adjustment.").

The expenses found to be nonchargeable by the circuit court in <u>Beck</u> included those for "lobbying efforts." <u>Beck</u> v. <u>Commc'ns Workers</u>, 776 F.2d 1187, 1210–11 (4th Cir. 1985), <u>aff'd</u>. 487 U.S. at 742. But the record made clear that the Union made no attempt to show that the lobbying was germane to collective bargaining. <u>Id.</u> at 1211. Indeed, the special master's conclusion as affirmed by the Fourth Circuit suggested that some types of lobbying, not at issue in <u>Beck</u>, might be chargeable. <u>Id.</u> (approving a special master's determination that, while "there might have been some areas" in which "'lobbying' would have some relevance" to collective bargaining, the union "had made no effort to identify any such permissible 'lobbying activities'"). So <u>Beck</u>'s ultimate affirmance of the lower court ruling, 487 U.S. at 742, provides us with no rule categorically dealing with lobbying expenses.

While <u>Beck</u> provides the only Supreme Court holding evaluating the chargeability of lobbying expenses in the context

of private-employer unions governed by the NLRA, the Court's earlier decision interpreting the Railway Labor Act in International Association of Machinists v. Street can be read as perhaps categorically treating as nonchargeable amounts spent "to support candidates for public office, and advance political programs." 367 U.S. 740, 768 (1961); see id. at 744 & n.2, 768–70 (discussing funds used to "promote legislative programs" and determining that the Railway Labor Act did not allow unions to use non-members' fees "to support political causes objected to by the employee"). By 1963, however, the Court did not seem to presume that it had already limned a clear boundary between political expenses and those germane to collective bargaining. See Bhd. of Ry., Airline & S.S. Clerks v. Allen, 373 U.S. 113, 121 (1963) (declining in a Railway Labor Act case to "attempt to draw the boundary between political expenditures and those germane to collective bargaining" where the courts below had declined to do so). And to the extent that boundary is more of an overlap consisting of expenses that can be called both political and germane to collective bargaining, the court offered no view in either case, or subsequently in Beck, on how to resolve the conflict.

There are several Supreme Court cases addressing the chargeability of lobbying expenses by public-sector unions. See, e.g., Lehnert v. Ferris Fac. Ass'n, 500 U.S. 507, 520 (1991)

- 7 -

(explaining that when "challenged lobbying activities relate not to the ratification or implementation of a dissenter's collective bargaining agreement, but to financial support of the employee's profession or of public employees generally, the connection to the union's function as bargaining representative is too attenuated to justify compelled support by objecting employees"); Abood v. Detroit Bd. of Educ., 431 U.S. 209, 235–36 (1977) (holding that objecting non-members could not be compelled to pay agency fees for "the advancement of other ideological causes not germane to [the union's] duties as collective-bargaining representative"). These holdings distinguishing chargeable from nonchargeable lobbying expenses incurred by public-sector unions no longer serve their intended purpose in the public-sector context, because the Supreme Court more recently decided that public-sector unions cannot require nonmember employees to pay any expenses at all. See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., 138 S. Ct. 2448, 2486 (2018). The parties in this case nevertheless cite to and rely on pre-Janus public-sector lobbying cases as analogous authority for their respective positions.[2] And indeed, there is

---

[2] Thus, the Board points to Harris v. Quinn, 573 U.S. 616, 636–37 (2014), and Lehnert as supporting its position that "relevant Supreme Court . . . precedent compels holding that lobbying charges are not chargeable as incurred during the union's performance of statutory duties as the objectors' exclusive bargaining agent." The Union on the other hand cites to the same cases to back up its argument that lobbying may sometimes be a part of collective bargaining. See Harris, 573 U.S. at 636–37

nothing in Janus that purports to reject or modify Abood's assumption that some lobbying might be at least germane to collective bargaining by public-sector unions. See Janus, 138 S. Ct. at 2486 (explaining that Abood should be overruled given "that Abood's proponents have abandoned its reasoning, that the precedent has proved unworkable, that it conflicts with earlier First Amendment decisions, and that subsequent developments have eroded its underpinnings [seeking to promote labor peace and avoid free riders]" but saying nothing about the conceptual possibility that some lobbying could be germane to bargaining); see also Abood, 431 U.S. at 236 ("The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process.").

We therefore consider the pre-Janus public-sector Supreme Court cases, but with a recognition that the concerns arising from compelled union fees differ markedly in the public

---

(explaining that "both collective-bargaining and political advocacy and lobbying are directed at the government"); Lehnert, 500 U.S. at 519-20 ("To represent their members effectively . . . public sector unions must necessarily concern themselves not only with negotiations at the bargaining table, but also with advancing their members' interests in legislative and other 'political' arenas.").

- 9 -

sector as compared to the private sector. On one hand, the Supreme Court has been clear that in the public sector, acting as a collective-bargaining representative often necessarily involves interaction with government officials in a way that is not often necessary in the private sector. Lehnert, 500 U.S. at 520 ("Public-sector unions often expend considerable resources in securing ratification of negotiated agreements by the proper state or local legislative body. Similarly, union efforts to acquire appropriations for approved collective-bargaining agreements often serve as an indispensable prerequisite to their implementation. . . . The dual roles of government as employer and policymaker in such cases make the analogy between lobbying and collective bargaining in the public sector a close one." (citations omitted)). On the other hand, the concerns about government-compelled political speech that dominate the question in the public-sector context, see Janus, 138 S. Ct. at 2478, are less potent in the private-sector context.

The element common to both private- and public-sector caselaw regarding the chargeability of union expenses is a focus on the relationship between the expenses and the union's performance of its duties as the exclusive bargaining agent for all the employees. See Lehnert, 500 U.S. at 519 (requiring that chargeable activities be "germane to collective-bargaining activity" (internal quotation marks omitted)); Beck, 487 U.S. at

745 (holding that non-members could not be charged "to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment"); Abood, 431 U.S. at 235-36 (holding that unions may not charge non-members for "the advancement of . . . ideological causes not germane to its duties as collective-bargaining representative").

The caselaw asks not whether challenged expenses are "incurred during" bargaining or the performance of other statutory duties, as the Board asked in this case, but whether the expenses are "necessary" for or "germane to" those duties. Beck, 487 U.S. at 745, 762-63. Further, the cases make clear that activities for which expenses are chargeable may consist of more than direct dealing and negotiation with employers. See, e.g., Ellis, 466 U.S. at 448-55 (in the context of the Railway Labor Act finding expenses chargeable for a national convention "at which the members elect officers, establish bargaining goals and priorities, and formulate overall union policy," "refreshments for union business meetings and occasional social activities," and publications including "articles about negotiations, contract demands, strikes, unemployment and health benefits, . . . and recreational and social activities," excluding the pro rata costs of any lines in the publications devoted to political issues).

We do agree with the Union that there is no conceptual reason for concluding that lobbying by a private sector union could

never be necessary to the union's performance of its collective bargaining duties. To illustrate, in collective bargaining the Union could attempt to secure a wage increase or other benefit contingent on the employer's receipt of revenues to fund the increase or benefit. In this very case, for example, the Union lobbied for a bill in Rhode Island that would have increased state payments to certain acute-care hospitals, which payments it believed one hospital would necessarily have to turn over at least in part to nurses per the terms of the applicable collective bargaining agreement. Similarly, in Vermont the Union lobbied for a bill to increase mental health care funding, which it believed would make more funds available for wages (and which it committed to lobbying for in the relevant collective bargaining agreements). Were those funds coming from a private source, we see no obvious reason why the Union might not reach out to urge that source to deal with the employer, especially if the Union had some influence with the source. The Board in turn points to no reason why the expense of trying to help the employer secure payment to fund success at the bargaining table would not be germane to collective bargaining. That same expense aimed at influencing the source of funds would likely be called "lobbying" if the source, as here, were the government. And such expenses would become no less germane merely because the source of funding might be the government. So we are indeed left to conclude that, in theory,

there exist instances in which an expense could reasonably be called both a form of lobbying and germane to collective bargaining. And nothing in the Supreme Court's actual holdings compels us to conclude either that such expenses are properly chargeable to dissenters, or not.

There is, though, the following statement in Lehnert:

> [Street, Allen, and Ellis] make clear that expenses that are relevant or "germane" to the collective-bargaining functions of the union generally will be constitutionally chargeable to dissenting employees. They further establish that, at least in the private sector, those functions do not include political or ideological activities.

Lehnert, 500 U.S. at 516 (emphasis added). While dictum (because Lehnert was a public-sector case), the above passage is Supreme Court dictum, and it also claims a provenance in the Court's earlier opinion in Street, which we have acknowledged can be read as perhaps categorically treating as nonchargeable amounts spent "to support candidates for public office, and advance political programs" (see p. 6-7, supra). Furthermore, two decades later the Supreme Court strongly suggested that it had drawn a "line" in the private sector between collective-bargaining and lobbying. See Harris v. Quinn, 573 U.S. 616, 636-37 (2014) ("In the private sector, the line is easier to see. Collective bargaining concerns the union's dealings with the employer; political advocacy and lobbying are directed at the government. But in the public sector,

both collective-bargaining and political advocacy and lobbying are directed at the government."). Certainly, too, <u>Janus</u>, while dealing only with public-sector unions, signals no increased tolerance for the compelled funding of lobbying by non-member dissenters in the private sector.

We are bound by the Supreme Court's "considered dicta." <u>McCoy</u> v. <u>Mass. Inst. of Tech.</u>, 950 F.2d 13, 19 (1st Cir. 1991) ("[F]ederal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement."); <u>see also</u> <u>United States</u> v. <u>Moore-Bush</u>, 963 F.3d 29, 39-40 (1st Cir. 2020) ("Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when, as in this instance, badges of reliability abound." (quoting <u>United States</u> v. <u>Santana</u>, 6 F.3d 1, 9 (1st Cir. 1993))). Given the clarity of the Supreme Court's statement in <u>Lehnert</u>, its basis in the Court's analysis of its previous cases, and the suggestion in <u>Harris</u> that a line has been drawn, we cannot dismiss <u>Lehnert</u>'s dictum as anything but "considered." It would appear, not surprisingly, that the Board may have to accord similar deference to considered Supreme Court dicta, <u>see</u> 800 River Rd. Operating Co., 369 N.L.R.B. No. 109, at *6 n.16 (2020) ("Even if properly characterized as dicta, the

- 14 -

meaning of the [Supreme] Court's language is clear, and we have serious doubts whether the Board has the authority to 'change its mind' in contravention of the Court's own mindset."). Neither party argues to the contrary.

Applying Lehnert's considered dictum to this case, we see no convincing argument that legislative lobbying is not a "political" activity -- at least as conducted here. See Political, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/political (last visited Sept. 10, 2020) (defining "political" as "of or relating to government, a government, or the conduct of governmental affairs"); see also Lobby, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/lobbying (last visited Sept. 10, 2020) (defining "lobby" as "to conduct activities (as engaging in personal contacts or the dissemination of information) with the objective of influencing public officials and especially members of a legislative body with regard to legislation and other policy decisions"). And in fact, the Supreme Court in Harris grouped "lobbying" with "political advocacy" as a presumably nonchargeable "activity directed at the government." Harris, 573 U.S. at 636.

There is added reason that may well inform Lehnert's categorical rejection of charging dissenters for lobbying expenses in private-sector unions. The best case for charging such expenses

would apply very rarely in the private sector precisely because the government is not the employer with whom the union bargains. A more flexible approach that nevertheless made room for charging such expenses only when the nexus to bargaining was especially clear would apply with little frequency, and would come with no easy-to-apply objective measure.  As a result, the transaction costs of establishing the chargeability of such expenses would likely outweigh the amounts involved.  Furthermore, in the ordinary case, the dissenting employees would lack the resources to press their objections.  Unions, in turn, would be tempted to press the margins, figuring that sustained opposition might be unlikely. There is thus a certain practicality to drawing a brighter line, as Lehnert suggests and as the Board did here.[3]

Finally, the Board's decision also appears to be in accord with the decision of the only other circuit to address the issue at hand.  See Miller v. Air Line Pilots Ass'n, 108 F.3d 1415, 1422-23 (D.C. Cir. 1997) (employing a different analysis but arriving at the same result, a "line between . . . collective

---

[3]  We cite this practicality as a reason to take Lehnert's dictum at face value.  We do not rely on it as an alternative basis -- not adopted by the Board, though employed at oral argument by its counsel -- for sustaining the Board's ruling even if the caselaw left room for the Board to rule either way.  See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

bargaining expenditures and those relating to the union's government relations," reasoning that "[i]f there is any union expense that . . . must be considered furthest removed from 'germane' activities, it is that involving a union's political actions").

Of course, the Supreme Court is not bound by its own dicta. And as our foregoing discussion illustrates, the Court might well regard its actual holdings and reasoning as leaving room for the Board to interpret the statute either way. Unless and until the Court does so, however, we must regard the matter as settled.[4] We uphold the Board's decision on the Union's lobbying expenses.

**B.**

The Union also petitions for review of the Board's determination requiring it to provide Geary a letter signed by an auditor verifying that the financial information disclosed to the objectors had been independently audited (the "audit verification letter"). In Chicago Teachers Union v. Hudson, the Supreme Court held that "basic considerations of fairness . . . dictate that the potential objectors be given sufficient information to gauge the

_____

[4] Our agreement with the Board that the Supreme Court's decisions compel the Board's ruling that expenses germane to collective bargaining do not include lobbying eliminates any need to consider the Union's argument that the Board abused its interpretative discretion by failing to acknowledge that it was changing Board policy.

propriety of the union's fee." 475 U.S. 292, 306 (1986).[5] The Board had determined well before it decided this case that, under Hudson, union expenditures provided to objecting employees must be verified by an independent audit. See United Food & Com. Workers Union, 363 N.L.R.B. No. 127, at *4 (2016); Am. Fed'n of Television & Rec'g Artists, 327 N.L.R.B. 474, 476 (1999). The Union does not challenge that baseline requirement. Instead, the Union argues that the additional requirement of providing a letter verifying that the audit took place is unreasonable.

The Board's conclusion here reasonably applied and extended the Hudson standard. As the Board pointed out, providing an audit verification letter to objecting employees avoids "requiring [employees] to accept the union's bare representations that the figures were appropriately audited." See Cummings v. Connell, 316 F.3d 886, 892 (9th Cir. 2003) (requiring the same and reasoning that an auditor's certification "that the summarized figures have indeed been audited and have been correctly reproduced from the audited report" would allow the objectors to rely safely on the union's figures). At oral argument, counsel for the Union acknowledged that the additional step of providing a letter

---

[5] Although Hudson was a public-sector case and not an NLRA case, the Board has applied it to its analyses of unions' statutory duty of "fair representation" under NLRA § 8(b)(1)(A). See Cal. Saw & Knife Works, 320 N.L.R.B. 224, 233 (1995) (citing Abrams v. Commc'ns Workers, 59 F.3d 1373, 1379 n.7 (D.C. Cir. 1995)). Neither party contests Hudson's applicability to the issue here.

- 18 -

verifying the audit would cause no harm to a union, and of course the additional step might save both parties litigation costs. As a result, we see no reason why the Board erred in adopting a requirement that such an audit verification letter be included in the "information" to be supplied objectors under Hudson. Nor does the fact that no one in this case apparently had any reason to doubt the accuracy of the Union's factual assertions concerning both its expenditures and its audit give us pause. "Trust but verify" is a reasonable approach for the Board to take, especially when the Union can cite no good reason for not supplying an audit verification letter to confirm that an audit has been performed as claimed. See Fall River Dyeing & Finishing Corp., 482 U.S. at 42 ("If the Board adopts a rule that is rational and consistent with the Act, then the rule is entitled to deference from the courts." (citations omitted)).

The Union argues, alternatively, that even if we uphold the Board's ruling that unions must supply an audit verification letter as part of the information to be supplied under Hudson, it would be unfair -- that is, a manifest injustice -- to apply this rule to the Union in this very case.[6] New rulings most often do

---

[6] The Board argues that, by not raising it before the Board, the Union waived its retroactivity argument. Under section 10(e) of the NLRA, 29 U.S.C. § 160(e), "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." The Union,

apply to the parties in the case in which the rule is adopted. See SEC v. Chenery Corp., 332 U.S. 194, 203 (1947) ("Every case of first impression has a retroactive effect . . . .").

To identify exceptions, the Board considers: (1) the parties' reliance on preexisting law, (2) the "effect of retroactivity on accomplishment of the purpose of the Act," and (3) "any particular injustice arising from retroactive application." Graymont PA, Inc., 364 N.L.R.B. No. 37, at *11 (2016). Here, the Union claims to have relied on preexisting law in refusing to provide the letter but points to no law clearly indicating that it need not produce the letter. See, e.g., Teamsters Local 75, 329 N.L.R.B. No. 12, at *30 (1999) (explaining that "[t]he Union's duty of fair representation . . . is met if it supplies its major categories of expenditures and supplies verified figures," but not clarifying whether or how a union might be required to show that the figured are indeed verified). The argument in favor of producing the audit verification letter -- described above -- was certainly foreseeable. Hoping that one wins a contested issue is hardly the type of reliance that provides

---

though, did argue in front of the Board that requiring an audit verification letter would amount to a new rule. Whether that contention preserved the retroactivity argument, we need not decide, given our finding that the argument fails. Cf. Seale v. INS, 323 F.3d 150, 155–57 (1st Cir. 2003) (explaining that we may bypass the question of statutory jurisdiction where there is a clear answer on the merits).

cause for not applying a ruling to the case in which it is issued. On the second factor, we acknowledge -- as the Union points out -- that no party has contended that Geary was unable to decide which expenses to challenge without the audit verification letter, nor does there appear to be any dispute as to whether the expenses actually were verified by an independent audit in this case. On the other hand, however, the Union has clearly acknowledged that it will suffer no injury at all by providing the audit verification letter. And the audit verification letter would clearly further the purposes of the NLRA, as described above. For those reasons, we find no injustice in the Board's application of its ruling in this case to the parties in this case.

Lastly, the Union argues that we may not reach the audit verification issue at all because it was not raised in Geary's amended complaint. This is untrue. That complaint alleges: "Since on or about September 30, 2009, Respondent has failed to provide Geary and other similarly situated employees with evidence beyond a mere assertion that the financial disclosure . . . was based on an independently verified audit."

## III.

For the reasons explained above, we uphold the Board's decision on the lobbying expenses. On the issue of the audit verification letter, we uphold the Board's decision. Consequently,

we <u>deny</u> the Union's petition for review in its entirety and <u>grant</u> the Board's cross-petition for enforcement.