**UNITED STATES of America**

v.

**Rafael SANTANA, Cornell Everett, Lillian Santana, Frank Fuentes, Floyd Henry, Uneria Capers, and Jackie Everett, Defendants.**

**Crim. No. 91–30019–F.**

United States District Court,
D. Massachusetts.

Dec. 10, 1992.

William J. O'Grady, Law Office of William J. O'Grady, Springfield, MA, Leonard Cohen, Cain, Hibbard, Myers & Cook, Pittsfield, MA, Richard T. Brown, East Longmeadow, MA, for Rafael Santana.

Robert M. Simels, New York City, for Lillian Santana.

Peter Ettenberg, Gould & Ettenberg, Worcester, MA, for Francis Fuentes.

Matthew J. King, Robinson, Donovan, Madden & Barry, Springfield, MA, for Floyd Robert Henry.

David P. Hoose, Katz, Sasson & Hoose, Springfield, MA, for Jackie Everett.

## MEMORANDUM AND ORDER

FREEDMAN, Senior District Judge.

### I. INTRODUCTION

On September 11, 1992, Magistrate Judge Michael A. Ponsor ("Magistrate Judge") denied, without a hearing, all seven of defendants' motions for dismissal of the indictment. Report and Recommendation Regarding Defendants' Motions for Dismissal of Indictment for Outrageous Governmental Conduct, slip op. (September 11, 1992) (Ponsor, U.S.M.J.) ("Report and Recommendation"). Four of the defendants[1] have filed objections to the Report and Recommendation, and have requested a hearing with respect to the government's tactics and investigatory techniques.

At bottom, defendants contend that the indictment must be dismissed, *in toto*, because the government supplied defendant

---

1. Only the objections of defendants Capers, Cornell Everett, Fuentes and Henry (collectively, "defendants") are before the Court. Defendant Cornell Everett filed late, but the Court had granted his motion for enlargement of time to file. Defendant Lillian Santana filed her objection to the Report and Recommendation several days late, without permission of the Court. In light of the Court's holding, the Court's refusal to entertain defendant Lillian Santana's tardy submission is immaterial, for the charges against her would stand in any event.

Fuentes with a thirteen and three-tenths (13.3) gram sample of ninety-two percent (92.0%) pure heroin, unrecovered by the government and presumably channeled to end-users, in hope of gaining defendants' trust and confidence. The government's behavior, according to defendants, constitutes extreme and outrageous conduct, and the Court, they contend, should dismiss the indictment for violation of the fifth amendment due process clause and/or pursuant to the Court's supervisory powers.

The government denies that an evidentiary hearing is necessary, and defends, of course, the actions of the undercover officers. The government vehemently opposes defendants' objections to the Report and Recommendation.

The Court agrees that a hearing on the matter is unnecessary, for the salient uncontested facts are well articulated in the numerous submissions and the prevailing law settles the fundamental issue before the Court. Nonetheless, the Court concludes, in contrast with the recommendation of the Magistrate Judge, that Count III of the indictment against defendants Fuentes and Raphael Santana must be dismissed for extreme and outrageous governmental conduct. The balance of the charges faced by defendants Fuentes and Raphael Santana, as well as the counts against the remaining defendants, shall stand.

## II. BACKGROUND

The facts relevant for purposes of defendants' motions are straightforward. In February of 1991 the government began investigating a purported heroin importation and distribution ring. Affidavit of Special Agent Gilbert A. Howard at ¶ 3 (August 26, 1991) (attached to Criminal Complaint, No. 91–1626–M (August 26, 1991)) ("Howard Affidavit"). A confidential informant, incarcerated with defendant Raphael Santana at a federal prison, apparently initiated the government's case when "in the fall of 1990 [Raphael] Santana told [the informant] that he was partners with Francis Fuentes and George Morales in the heroin distribution business." *Id.* at ¶¶ 3–

4. The informant, serving a twenty-four (24) year term, had been convicted of conspiracy to import seven (7) kilograms of heroin, and defendant Raphael Santana had been jailed for a life term for conspiring to import and distribute one thousand (1,000) kilograms of heroin and for laundering some $1.1 million. *Id.* at ¶ 3. Defendant Fuentes had "previously been convicted at least twice in federal court for drug trafficking." *Id.* at ¶ 4. Defendant Raphael Santana allegedly told the government informant that his network was capable of "distributing between 150 and 200 kilograms of heroin per month throughout the United States." *Id.*

The reverse sting operation progressed and, according to the government, defendant Raphael Santana and the informant agreed by March of 1991 to import and distribute one hundred forty (140) kilograms of heroin. The government contends that defendant Fuentes, not imprisoned, served as chief negotiator for the drug deal. *Id.* at ¶¶ 7, 14–16, 18–21, 27, 34–35, 40.

On July 12, 1991 Special Agent Howard, in an undercover capacity, a second confidential informant and defendant Fuentes met at a hotel in Greenfield, Massachusetts. *Id.* at ¶ 21. During a conversation in the hotel's lounge, defendant Fuentes allegedly requested a sample of the heroin, and the government agreed to contact defendant Fuentes when a sample was readied. *Id.*

On August 8, 1991, the three met once again at the hotel in Greenfield. *Id.* at ¶ 34. This time, Special Agent Howard delivered to defendant Fuentes a sample of heroin. *Id.* The sample contained thirteen and three-tenths (13.3) grams of the drug, at ninety-two percent (92.0%) purity. *See* Report of Drug Property Collected, Purchased or Seized (attached to Government's Response to Additional Pretrial Motions (February 18, 1992)). There is no dispute that the heroin sample went unrecovered by the government.

## III. STANDARD OF REVIEW

■ A dissatisfied litigant may obtain review of a dispositive pretrial motion is-

sued by a magistrate judge by filing an objection to a report and recommendation in the district court. A *de novo* standard of review applies. The district court may accept, reject or modify the recommendation, receive additional evidence or recommit the matter to the magistrate judge with instructions. *Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) (citing Fed. R.Civ.P. 72; 28 U.S.C. § 636(b)(1)(B); Rules for United States Magistrates (Local Rule 3(b)).

## IV. DISCUSSION

### A. *Government Provision of Narcotics*

At the outset, the Court agrees that authority does not prohibit *per se* the government from supplying a modest sample of drugs to suspects in the course of a criminal narcotics investigation. In limited circumstances, this tactic may prove acceptable.[2] *See, e.g., Hampton v. United States,* 425 U.S. 484, 489–90, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976) (plurality op.) (government furnishes heroin sample and subsequently purchases the heroin); *id.* at 491–92, 96 S.Ct. at 1650–51 (Powell, J., concurring in the judgment); *United States v. Ford,* 918 F.2d 1343, 1349 (8th Cir.1990) ("a small quantity of cocaine and a small quantity of heroin"); *United States v. Valona,* 834 F.2d 1334, 1344 (7th Cir. 1987) (three and one-half (3.5) grams of cocaine); *United States v. Buishas,* 791 F.2d 1310, 1314 (7th Cir.1986) (sixty-nine (69.0) grams of marijuana). Careful consideration of the facts of these cases teaches, though, that the government does not enjoy unfettered discretion in dispensing narcotics to facilitate its investigations. Rather, several factors emerge for the courts to weigh in evaluating this potentially harmful investigative tactic.

In *Hampton,* the plurality and concurring opinions together established, for dissimilar reasons, that supplying illicit drugs to a suspected drug dealer does not necessarily implicate the due process clause and bar prosecution of the suspect. In that case, involving a conviction on two counts of distributing heroin, a government informant allegedly supplied the defendant with samples of heroin, and government undercover agents purchased the heroin from the defendant. The plurality opinion, written by then Justice Rehnquist, sought to frame the issue solely as one of entrapment and, because defense counsel conceded that the defendant was predisposed to commit the offense, the entrapment defense was of no avail. *Hampton,* 425 U.S. at 489–90, 96 S.Ct. at 1649–50 (plurality op.). The plurality, then, declined to address the issue raised by defendants in this case. In his concurrence, Justice Powell, joined by Justice Blackmun, explicitly approved of the provision of the contraband, reasoning that "the due process clause does not foreclose reliance on such investigative techniques." *Id.* at 491, 96 S.Ct. at 1651 (Powell, J., concurring in the judgment). The three dissenters argued that the government's furnishing of narcotics was particularly egregious. *Id.* at 499, n. 3, 96 S.Ct. at 1654, n. 3. For purposes of the present analysis, it is noteworthy that the government, in *Hampton,* recovered the narcotics provided to the defendant.

The balance of the cases cited above, likewise fail to bow to unbridled executive discretion regarding the provision of drug samples in undercover investigations, especially where the drugs go unrecovered. In *Ford,* the Eighth Circuit repeatedly stated that the quantities of cocaine and heroin were "small." *Ford,* 918 F.2d at 1346, 1349–50. Moreover, the heroin in question originated with the defendant, was given to the government undercover agent, and was returned to the defendant, at the defendant's request, a short time later. *Id.* at 1346 ("While they were waiting, Ford gave Rainville [the government agent] a small quantity of heroin as a sign of good faith.... Ford then asked Rainville to return the sample of heroin so he could sell it and make some money. Rainville gave the sample back to Ford."). In addition, the court highlighted that the suspect to whom the sample was given was a known addict.

---

**2.** The wisdom of such practice is another question altogether, and not one before the Court.

*Id.* at 1347, 1349–50. In fact, the defendant testified at trial that he had used the samples of heroin and cocaine for his own use, and had used monies supplied by the government during the course of the investigation to procure additional drugs for his personal consumption. *Id.* at 1347. Throughout the course of the investigation, the defendant requested narcotics from the government agent. *Id.* at 1346. The Eighth Circuit's holding incorporates these salient facts:

> We hold, therefore, that an undercover officer's providing a *known addict* with *small quantities* of drugs to facilitate and enhance the undercover relationship does not constitute outrageous conduct.

*Id.* at 1350 (emphasis added). In *Ford*, then, it was unnecessary for the court to consider the implications of large government drug supplies augmenting the illicit narcotics trade; although the small samples went unrecovered, the drugs provided presumably were consumed by the recipient, a known addict. Finally, as a careful reading of *Ford* makes apparent, the defendant was not indicted with respect to the contraband supplied by the government.

The *Valona* decision by the Seventh Circuit Court of Appeals fares the government no better. In that case, the defendant did not explicitly request the sample of cocaine; rather, a confidential informant apparently informed the defendant that a sample "was available for testing." *Valona*, 834 F.2d at 1336. The government's proffer, however, arguably resulted, at least in part, from the defendant's representation that "he had access to a mass spectrometer, a testing instrument that could be used to test the purity of cocaine." *Id.* Although the court refused to characterize the governmental conduct as outrageous, several familiar factors are worthy of attention. First, the drug sample provided was cocaine, not heroin. Second, the Eighth Circuit described the sample size as "small," and emphasized the legal significance associated with the size of the sample amount. *Id.* at 1344–45. Third, the defendant was indicted only for attempted possession of ten (10) kilograms of cocaine

with intent to distribute, and was not charged with respect to the three and one-half (3.5) gram cocaine sample. *Id.* at 1335. Finally, albeit the government failed to recoup the cocaine, the sample was provided in order to allow for purity evaluation, and the defendant did not indicate that he intended to distribute the narcotics sample. *Id.* ("Apparently Valona said that if testing showed that the cocaine was as pure as Schabilion [the undercover agent] claimed, he and his associates might want to purchase up to twenty kilograms of the drug.").

The *Buishas* case, too, may be distinguished from the matter at hand along the same lines discussed above. In *Buishas*, the government supplied the sample of marijuana, two one-ounce bags, at the defendant's request. *Buishas*, 791 F.2d at 1312. The court noted the small size of the marijuana sample. *Id.* at 1314; *see also Valona*, 834 F.2d at 1344 (citing *Buishas* with regard to the small sample size). The supplied sample did not constitute the contraband for which the defendant was indicted and convicted. *Buishas*, 791 F.2d at 1311; *see also Valona*, 834 F.2d at 1344 (citing *Buishas*). Although the defendant indicated to the undercover agent that the marijuana samples would be sent to two of the defendant's associates, the defendant did smoke some marijuana in the presence of the agent. *Buishas*, 791 F.2d at 1312.

### B. Factor Analysis and Outrageous Government Conduct

█ In each of the cases discussed above, decisions cited by the government, the courts declined to dismiss the indictments on the basis of extreme and outrageous conduct. Nonetheless, several distinct criteria emerge, from the underlying factual contexts, that guide the courts' determinations.

First, the Court must examine the type of drug furnished by the government, *i.e.*, whether the government supplied a dangerous, highly addictive drug like heroin, or whether the government supplied a relatively less addictive narcotic, such as, say, marijuana. The very fact that state and

federal laws almost invariably categorize narcotic offenses based on some notion of dangerousness serves as a reality check for this factor.

Second, the Court must consider the potency or purity of the drug sample. Obviously, the more potent the drugs provided, the greater the potential for overdose should the sample go unrecovered. Alternatively, drugs of high purity may be diluted by additives, multiplying the quantity of useable narcotics and augmenting the overall drug supply by more than the sample amount.

Third, the Court must gauge the relative size of the sample. The significance of this element is self-evident.

Fourth, the Court must observe whether the defendant requested the sample, or whether the government provided the drugs without inducement by the defendant. Where the defendant asks for a sample, the government's compliance with the request quite plausibly builds trust and confidence in furtherance of the criminal investigation. Where the government metes out drugs in the absence of encouragement by the defendant, the government arguably imposes unnecessary risks on society. This consideration goes to the necessity of the government's provision of narcotics.

Fifth, the Court must consider whether the sample of narcotics was recovered by the government, or whether the government's provision of drugs contributed to the aggregate supply of narcotics. Drugs furnished but not recovered by the government foster the harm that the narcotics laws serve to prevent.

Sixth, where the drug sample or a portion thereof goes unrecovered, the Court must inquire as to the likely disposition of the drugs, *e.g.*, whether the defendant personally consumed the drugs, whether the defendant tested the drugs for authenticity or purity or whether the defendant distributed the drugs to other dealers or end-users. If a known addict repeatedly requests drug samples for personal use, or if a suspect asks for a sample for evaluation purposes, then the traceable harm is local-ized and contained. Where a suspect solicits drugs for distribution, the government supplies the drugs and the drugs go unrecovered, the potential harm is indefinite and untraceable, quite probably affecting innocent persons outside of the distribution chain.

Seventh, the Court must note whether the drug sample constitutes the *corpus delicti* of a crime for which the defendant is charged. The courts should be somewhat reluctant to allow the government to provide the defendant with a sample of narcotics, only to charge the defendant with possession or distribution of the sample. This is especially true where the government's rationale for furnishing the sample is to build trust and confidence between the government undercover agent and the defendant in order to collar the defendant for a greater violation of the narcotics laws. The government's case, it seems, should center on the greater violation when such a rationale is put in play.

This listing is not exhaustive, however, and other facts and circumstances, raised by either the government or the defendant, may be considered by the Court in evaluating the propriety of the government's provision of narcotics in the course of an undercover investigation.

Here, the government supplied defendant Fuentes with heroin, an evil, highly addictive drug that commonly is taken intravenously. It is no secret that the spread of the AIDS virus and other serious diseases has been linked with the sharing of infected needles among drug addicts. The tremendous harm to society caused by heroin abuse cannot be ignored by the Court in evaluating the government's provision of the heroin sample in this instance.

The second criterion, the purity of the drug sample provided, also cuts against the government. The heroin in question was extremely potent, some ninety-two percent (92.0%) pure. Heroin of this concentration may be diluted and sold to numerous end-users, augmenting the drug supply several-

fold.[3]

Third, the heroin sample furnished by the government was sizable in amount, and the government has not attempted to argue otherwise. When the sample size of thirteen and three-tenths (13.3) grams is considered in light of the sample's relative purity, the conduct of the government boggles the mind. In its defense, the government asserts that defendants were major players in narcotics trafficking, so a large sample was required to win defendants' trust. The Magistrate Judge signed on to this reasoning in stating, "It takes a big hook to catch a big fish." Report and Recommendation at 3. This position is problematic, however. For the one thing, what happens when the government casts its line in search of a bigger fish? Must the courts tolerate even larger lures? Certainly there must be some limit to the quantity of drugs that the government can introduce to society. Moreover, unlike the situation at bar, when an angler reels in his prize, he or she always recovers the hook, and the bait is swallowed only by the catch.

The available evidence demonstrates that the fourth factor cuts in favor of the government. That is, defendant Fuentes apparently requested the heroin sample. Howard Affidavit at ¶ 21. Defendants do not contest this fact in their submissions. Setting aside the sample size and recoverability questions, the provision of some sample amount arguably advanced the investigation.

Because there is no dispute that the heroin sample was not recovered by the government, the fifth factor weighs in defendants' favor.

The sixth element likewise disfavors the government. It is practicably certain that the sample of heroin was distributed by defendants, although the government does not concede this point out of hand. There is no evidence that defendant Fuentes, a known felon, was a heroin addict who retained the sample for personal use; even if this were the case, it is dubious that he could have consumed such a vast quantity of relatively pure heroin. It is quite plausible to believe that a portion of the sample was tested for authenticity and purity by defendants, see Howard Affidavit at ¶ 40, but it would strain credulity to hypothesize that all of the heroin supplied by the government was used for testing purposes. Moreover, Count III of the indictment, charging defendants Fuentes and Raphael Santana with possession with intent to distribute the sample, evinces that the government, too, assumes that these two defendants planned to sell the supplied heroin.

Seventh, as just noted, the Court observes that Count III charges defendants Fuentes and Raphael Santana with possession with intent to distribute the heroin sample. The sample, therefore, constitutes the *corpus delicti* of a crime for which these two defendants are being prosecuted. Defendants Fuentes and Raphael Santana, as well as the balance of the defendants, face more serious charges of conspiracy to import and conspiracy to distribute some one hundred and forty-one (141) kilograms of heroin.

The government urges the Court to consider the sample size in relation to the amount of heroin defendants purportedly conspired to import and distribute. The thirteen grams of heroin furnished by the government certainly pales in comparison to some one hundred and forty kilograms that defendants sought to import and sell. In order to gain the trust and confidence of major traffickers, the argument goes, the government must be allowed to increase the sample size in direct relation to the *corpus delicti* of the crime. This position, though enticing at first, lacks force on thorough consideration, principally because it appraises the sample size only in relation to the quantity of narcotics involved in the underlying criminal conspiracy, failing to evaluate the sample size in relation to the

---

**3.** Parenthetically, defendants estimate that the heroin sample "could be processed into 255 grams of street-grade heroin, enough for 8,500 individual packets, with the potential street value of $170,000." Report and Recommendation at 2. Because defendants have produced no admissible evidence in support of this assertion, the Court declines to base its decision, in any respect, on this proposition.

other enumerated factors. In essence, the government's line of reasoning, if adopted by the Court, would ignore the other criteria, and in practice would allow vastly greater government supplies of drugs to infiltrate society.

Implicit in the government's proposal, however, is the notion that the quantity of drugs to be imported and distributed by defendants ought to factor into any analysis of the propriety of the government's conduct. Like the fourth element, this consideration properly goes to the practical necessity of providing a sample. The Court agrees that one hundred and forty-one kilograms is a lot of heroin, so this factor clearly cuts in favor of the government's provision of some sort of heroin sample.

■ Carefully weighing these factors, the Court nonetheless concludes that the government engaged in extreme and outrageous conduct in supplying defendant Fuentes, a known felon and a previously convicted drug trafficker, with a sizable amount of extremely potent heroin and, by design, neglect or indifference, in allowing Fuentes to walk away with the contraband. Here, the government enabled a sizable sample of almost pure heroin to supplement the drug supply, escalating the societal harms targeted by state and federal narcotics laws. Make no mistake, this concentrated quantity of a highly addictive drug is, by no measure, *de minimis,* and the government does not attempt to argue otherwise. Importantly, this is not a case in which any amount of extant heroin was removed from the narcotics trade; rather, the government's conduct served only to increase the aggregate sum of heroin available for consumption. In the Court's view, this sequence of events practicably seems tantamount to the government distributing the drugs itself. Quite frankly, the government's behavior, standing alone, is so offensive that it "shocks the conscience." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

## C. Outrageous Government Conduct and Third–Party Harm

The government contends that defendants may not move for dismissal of the charges for extreme and outrageous conduct, because defendants' rights have not been violated by the government's conduct, even if the government action were wrongful. The government cites the *Hampton* plurality opinion for this proposition, *Hampton,* 425 U.S. at 490–91, 96 S.Ct. at 1650–51 (plurality op.), but a majority of the United States Supreme Court has never embraced this view. Justice Powell's concurrence explicitly rejected this position, *id.* at 493–95, 96 S.Ct. at 1651–53 (Powell, J., concurring in the judgment), as did the dissent. *Id.* at 497, 96 S.Ct. at 1653 (Brennan, J., dissenting). Five Justices, then, did not foreclose reliance on the supervisory powers of the federal courts, or the concept of fundamental fairness embodied in the due process clause, to bar conviction of a defendant for extreme and outrageous government conduct. *Id.* at 493–94, 96 S.Ct. at 1651–52 (Powell, J., concurring in the judgment) (citing *United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. at 1637, 1642, 36 L.Ed.2d 366 (1973)); *id.* 425 U.S. at 497, 96 S.Ct. at 1653 (Brennan, J., dissenting) (citing *Russell,* 411 U.S. at 435, 93 S.Ct. at 1644).

Other courts have held that harm to innocent third parties resulting from outrageous government conduct may bar prosecution of a defendant even if the defendant's own rights were not violated. This is especially the case where the harm runs to third persons who are members of a class protected by the laws broken at the behest or indifference of the government. *See United States v. Chin,* 934 F.2d 393, 399–400 (2d Cir.1991). The infamous words of Judge Friendly, too, are instructive in this regard:

> [T]here is certainly a limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental "investigation" involving participation in activities that result in injury to the rights

of its citizens is a course that courts should be extremely reluctant to sanction. Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality.

*United States v. Archer,* 486 F.2d 670, 676–77 (2d Cir.1973) (footnote omitted). *See Valona,* 834 F.2d at 1344–45 (citing *United States v. Thoma,* 726 F.2d 1191, 1199 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984)) ("[T]his court has stated in the past that it will closely examine government conduct when the government supplies the contraband.").

In the case at bar, the government—again, by design, neglect or indifference—presumably allowed a large quantity of highly concentrated heroin, supplied by the government, to make its way to pushers and end-users. It is essentially impossible to characterize the potential harm caused to innocent parties as a result of the government's conduct. How does one quantify the harm suffered by the sole proprietor whose shop is robbed for drug monies? How does one evaluate the injury to society at the birth of a new heroin addict? How does one console the parents of a child pricked by an AIDS-infected hypodermic needle? Other scenarios abound, all involving potential victims whom the narcotics laws are designed to protect.

The Court has no trouble concluding that the extreme and outrageous conduct of the government, society's protector, substantially harmed the protected. In conducting its undercover operations, the government would do well to recall Justice Brandeis' dissent in *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the ensuing passage joined by Justice Holmes and Justice Stone:

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omniscient teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

*Id.* at 485, 48 S.Ct. at 575 (Brandeis, J., dissenting). The government, no doubt, must use "guile and clever tactics" in undercover drug investigations. *United States v. Panitz,* 907 F.2d 1267, 1273 (1st Cir.1990). Alas, even sinful tactics sometimes pass muster; in this case, however, the government simply went too far.

### D. Dismissal of Count III

The analysis does not stop here. Next, the Court must decide what price the government should pay for its appalling conduct.

The Court opines that outright dismissal of the entire indictment would constitute an inappropriate remedy in this instance. There is ample evidence before the Court establishing that the conspiracy to import and distribute one hundred and forty-one (141) kilograms of heroin was well in place before defendant Fuentes received the heroin sample. To dismiss Count I or Count II of the indictment against defendants would do little to further the interests of justice.

Defendants Fuentes and Raphael Santana, though, have been charged in Count III with possession and intended distribution of the heroin sample in question. Considering this count in light of the factors enumerated above, the Court holds that the government is barred from prosecuting defendants Fuentes and Raphael Santana on Count III of the indictment.

Therefore, Count III of the indictment is dismissed for extreme and outrageous government behavior. The Court dismisses this charge against defendants Fuentes and Raphael Santana for violation of the fifth amendment due process clause, and, alternatively, pursuant to the Court's supervisory powers:[4]

> Due process in essence means fundamental fairness, and the [United States Supreme] Court's cases are replete with examples of judgments as to when such fairness has been denied an accused in light of all the circumstances.... The fact that there is no sharply defined standard against which to make these judgments is not itself a sufficient reason to deny the federal judiciary's power to make them when warranted by the circumstances.... Much the same is true of analysis under the supervisory power.

*Hampton,* 425 U.S. at 494–95 n. 6, 96 S.Ct. at 1652–53 n. 6 (citations omitted) (Powell, J., concurring in the judgment). *See also Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43 ("[W]e someday may be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."); *Rochin,* 342 U.S. at 169–72, 72 S.Ct. at 208–09; *Panitz,* 907 F.2d at 1272.

## V. CONCLUSION

For the foregoing reasons, Count III of the indictment is dismissed for extreme and outrageous government conduct. The Court dismisses the charge for violation of due process and, alternatively, pursuant to the Court's supervisory powers.

It is So Ordered.

---

**4.** Although defendant Raphael Santana has not objected to the Magistrate Judge's Report and Recommendation denying dismissal, the Court, finding a violation implicating the constitution, nevertheless dismisses Count III against this defendant.