UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1393

UNITED STATES OF AMERICA,

Appellant,

v.

RAFAEL SANTANA AND FRANCIS FUENTES,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Frank H. Freedman, Senior U.S. District Judge]

Before

Selya, Cyr and Boudin, Circuit Judges.

Kevin O'Regan, Assistant United States Attorney, with whom

A. John Pappalardo, United States Attorney, and Andrew Levchuk,

Assistant United States Attorney, were on brief, for appellant.
Leonard H. Cohen, with whom William A. Rota, Nancy A. Lyon,

and Cain, Hibbard, Myers & Cook were on brief, for appellee

Santana.
Peter L. Ettenberg, with whom Gould & Ettenberg, P.C. was on

brief, for appellee Fuentes.
Wendy Sibbison, Burton Shostak, and Moline, Ottsen, Mauze,

Leggat & Shostak on consolidated brief for Massachusetts Ass'n of

Criminal Defense Lawyers and National Ass'n of Criminal Defense
Lawyers, amici curiae.

September 16, 1993

SELYA, Circuit Judge. In the six decades since Justice
SELYA, Circuit Judge.

Roberts noted that "[s]ociety is at war with the criminal

classes," Sorrells v. United States, 287 U.S. 435, 453 (1932)

(Roberts, J., dissenting), hostilities have escalated and

armaments have grown more destructive. Here, the government's

weapon was 13.3 grams of heroin, 92% pure, delivered into the

stream of commerce as part of an effort to gain the confidence of

suspected drug traffickers. The district judge decided that the

government's guerilla tactics impermissibly endangered civilians

and dismissed the ensuing charge. See United States v. Santana,

808 F. Supp. 77 (D. Mass. 1992). The United States appeals.

Although law enforcement officers might well profit from reading

the lower court's thoughtful opinion, we conclude that the court

exceeded its authority. Consequently, we reverse.

I. BACKGROUND

In 1991, the federal Drug Enforcement Administration

(DEA) mounted an elaborate reverse sting designed to bring a

mammoth heroin distribution network to ground. The DEA believed

that defendant-appellee Rafael Santana ran the ring from prison

through various henchmen, including defendant-appellee Francis

Fuentes. In the course of the sting, Fuentes asked an undercover

agent, posing as a heroin supplier, to furnish a sample of his

wares. The agent received a special dispensation from DEA

hierarchs and delivered 13.3 grams of heroin, 92% pure, to

2

Fuentes in August of 1991.1 The authorities never recovered the

sample.

There is a factual dispute over the size of the stakes.

The government, based on its agent's testimony, claims that the

deal under negotiation contemplated delivery of 141 kilograms of

heroin. It further claims, based on an informer's account, that

Santana's organization was capable of distributing up to 200

kilograms of heroin monthly. Appellees suggest that the

negotiations concerned a considerably smaller quantity of

narcotics, and that the organization, if it existed at all, was

far less ambitious. We need not enter this thicket; for present

purposes, the relevant finding is the reasonableness, at the time

the sample was furnished, of the government's belief that the

alleged organization had the capacity to manage widespread

distribution of heroin. It is not seriously disputed that the

government thought this to be the case; and, moreover, the

government's belief, given both the information in its files and

Santana's history he had been convicted in 1990 of conspiracy

to smuggle 1,000 kilograms of heroin was objectively

reasonable.

Having been made privy to the evidence collected in the

course of the government's indagation, a federal grand jury

1The heroin sample comprises about 2,500 doses of the size
and purity typically sold on the street. See Gerald F. Uelman &

Victor G. Haddox, Drug Abuse and the Law Sourcebook, 2.4(a) at

2-19 (1991). The DEA authorized delivery pursuant to section
III-E of the DEA's Domestic Operations Guidelines, 20 Crim. L.
Rep. (BNA) 3055-58 (Feb. 2, 1977).

3

returned a three-count indictment against seven defendants,

including appellees, in October of 1991. The defendants filed

pretrial motions seeking to dismiss the indictment on the ground

that the government acted outrageously in fronting so much heroin

and then losing track of it. A magistrate judge recommended that

the motions be denied. The district court rejected the

recommendation. Presuming that most of the unretrieved sample

reached end users, see id. at 79, the court found that the

government's actions exceeded the bounds of propriety, see id. at

81-84. It thereupon dismissed count 3 of the indictment (the

count for which the 13.3-gram sample formed the corpus

delicti).2 See id. at 85-86. The court derived its authority

from the due process clause of the Fifth Amendment, and,

alternatively, from its supervisory power. See id. at 86. The

government moved unsuccessfully for reconsideration3 and now

appeals. We have jurisdiction under 18 U.S.C. 3731 (1988).

There are two main legal points in contention. First,

2Count 3 named only Santana and Fuentes. Hence, they are
the lone appellees.

3The briefs highlight several other factual disputes. By
and large, these disputes hinge on the admissibility of an
affidavit appended to the motion to reconsider an affidavit
which tries to shed light on the sample's ultimate disposition
and the agent's motive in delivering it. Because this affidavit
was not proffered originally, and because the lower court made no
findings concerning it, we consider only two undisputed portions
of the affidavit, namely, that the agent, in asking his superiors
to arrange for a sample, believed that "Fuentes was testing
whether I was a real drug dealer," and that supplying the sample
"was an important part of Fuentes' evaluation whether to go
forward with the deal." We will assume, as appellees implore,
that most, if not all, of the 13.3 grams of heroin reached end
users.

4

the government denies that its conduct was outrageous. Second,

the government asseverates that the district court lacked

authority under either the due process clause or the rubric of

supervisory power to redress injuries to third parties by

dismissing charges against appellees. On the facts of this case,

we think that both points are well taken.

II. THE DOCTRINE OF OUTRAGEOUS MISCONDUCT

Outrageous misconduct is the deathbed child of

objective entrapment, a doctrine long since discarded in the

federal courts. See, e.g., Sherman v. United States, 356 U.S.

369, 372 (1958) (rejecting an objective entrapment approach in

favor of a subjective approach). The doctrine's midwife was

Chief Justice Rehnquist (then Justice Rehnquist), who, in the

course of championing a subjective theory of entrapment,

speculated that the Court might "some day be presented with a

situation in which the conduct of law enforcement agents is so

outrageous that due process principles would absolutely bar the

government from invoking judicial processes to obtain a

conviction. . . ." United States v. Russell, 411 U.S. 423, 431-

32 (1972). Seizing upon this dictum, the defendant in Hampton v.

United States, 425 U.S. 484 (1975), attempted to construct an

outrageous misconduct defense rooted in the due process clause.

Hampton lost his case but succeeded in legitimating the doctrine,

albeit precariously.4

4In Hampton, a concurrence combined with the plurality to

reject the appeal. However, the two concurring Justices switched
sides to form a different majority vivifying the doctrine of

5

Although it has a comfortably familiar ring,

"outrageous misconduct" is surpassingly difficult to translate

into a closely defined set of behavioral norms. The broadest

hints as to the content of the outrageousness standard lie in the

dictum that spawned the doctrine. Inasmuch as Rochin v.

California, 342 U.S. 165 (1952), is the case irrefragably linked

with the legal rubric of fundamental fairness, one hint is found

in Justice Rehnquist's citation to Rochin. See Russell, 411 U.S.

at 431-32. A second hint is contained in Russell's explicit

equation of outrageous misconduct with violations of "that

'fundamental fairness, shocking to the universal sense of

justice,' mandated by the Due Process Clause of the Fifth

Amendment." Russell, 423 U.S. at 432 (quoting Kinsella v. United

States ex rel. Singleton, 361 U.S. 234, 246 (1960)). Picking up

on these clues, most courts apply a variant on the fundamental

fairness standard as a sounding line for outrageousness. See

Mosley, 965 F.2d at 910 (collecting formulations). Although this

standard lacks mathematical precision, we agree with Justice

Frankfurter that imprecision of this nature does not leave courts

without adequate guidance; rather, "[i]n dealing not with the

machinery of government but with human rights, the absence of

formal exactitude, or want of fixity of meaning, is not an

unusual or even regrettable attribute of constitutional

provisions." Rochin, 342 U.S. at 169.

outrageous misconduct. See Hampton, 425 U.S. at 491-95 (Powell,

J. concurring).

6

The banner of outrageous misconduct is often raised but

seldom saluted. Even though one respected jurist contends that

the doctrine belongs in the dustbin of history, see United States

v. Miller, 891 F.2d 1265, 1271-73 (7th Cir. 1989) (Easterbrook,

J., concurring),5 case after case confirms its continued

existence. See Moran v. Burbine, 475 U.S. 412, 432 (1985) ("We

do not question that on facts more egregious than those presented

here police deception might rise to a level of a due process

violation."); United States v. Mosley, 965 F.2d 906, 909 (10th

Cir. 1992) (collecting cases from eleven circuits). Be that as

it may, the doctrine is moribund; in practice, courts have

rejected its application with almost monotonous regularity. See,

e.g., United States v. Barnett, 989 F.2d 546, 560 (1st Cir.

1993), petition for cert. filed (June 28, 1993) (No. 93-5018);

United States v. Lilly, 983 F.2d 300, 309-10 (1st Cir. 1992);

United States v. Marino, 936 F.2d 23, 27 (1st Cir. 1991); United

States v. Rosen, 929 F.2d 839, 842 (1st Cir.), cert. denied, 112

S. Ct. 77 (1991); United States v. McDowell, 918 F.2d 1004, 1008-

09 (1st Cir. 1990); see also United States v. Panitz, 907 F.2d

1267, 1272-73 (1st Cir. 1990) (collecting pre-1990 First Circuit

5In Judge Easterbrook's view, the appropriateness of the
government's decision to supply drugs as part of an undercover
operation presents a "political" question that is
quintessentially nonjusticiable. Miller, 891 F.2d at 1272. With

respect, we think this conceptualization stretches the military
analogy too far. We adhere instead to the idea that "those
charged with th[e] investigative and prosecutorial duty should
not be the sole judges of when to utilize constitutionally
sensitive means in pursuing their tasks." United States v.

United States District Court, 407 U.S. 297, 317 (1972).

7

cases declining to invoke the doctrine); United States v. Bogart,

783 F.2d 1428, 1434-38 (9th Cir.) (summarizing relevant case

law), vacated in part on other grounds sub nom. United States v.

Wingender, 790 F.2d 802 (9th Cir. 1986); United States v. Warren,

747 F.2d 1339, 1342-43 & nn. 7-8 (10th Cir. 1984) (collecting

precedents from various circuits). Indeed, since the Supreme

Court decided Hampton, a federal appellate court has granted

relief to a criminal defendant on the basis of the outrageous

misconduct defense only once. See United States v. Twigg, 588

F.2d 373, 382 (3d Cir. 1978). The historical record makes it

clear, therefore, that the outrageous misconduct defense is

almost never successful.6

There are two competing visions of the doctrine's role.

One school of thought holds that the defense should be confined

to cases involving extreme physical, and possibly psychological,

abuse of a defendant. See United States v. Kelly, 707 F.2d 1460,

1476 n.13 (D.C. Cir.) (per curiam) (collecting cases), cert.

denied, 464 U.S. 908 (1983). A second school of thought holds

that outrageous misconduct may also function as a kind of

supplement to the entrapment defense, reserved for those cases

6In addition to Twigg, one court of appeals invoked the

doctrine in an alternative holding, see United States v. Lard,

734 F.2d 1290, 1296 (8th Cir. 1984), and another directed the
district court to determine whether outrageous misconduct should
be found on remand, see Bogart, 783 F.2d at 1438. A smattering

of district courts have also applied the outrageous misconduct
doctrine to the defendant's advantage. See, e.g., United States

v. Marshank, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); United

States v. Gardner, 658 F. Supp. 1573, 1577 (W.D. Pa. 1987);

United States v. Batres-Santolino, 521 F. Supp. 744, 751-52 (N.D.

Cal. 1981).

8

where law enforcement personnel become so overinvolved in a

felonious venture that they can fairly be said either to have

"creat[ed]" the crime or to have "coerc[ed]" the defendant's

participation in it. Mosley, 965 F.2d at 911-12; see also

Bogart, 783 F.2d at 1436-38. This case does not require us to

choose between these two conceptions of the doctrine.

III. APPLYING THE DOCTRINE

Having traced the evolution of the doctrine of

outrageous misconduct, we proceed to consider its applicability

in this case. Although what transpired here fits neither of the

conventional patterns of outrageous misconduct described above,

the district court nonetheless ruled that furnishing the hefty

heroin sample (and then losing track of it) comes within the

doctrine's sweep. We conclude, for two independently sufficient

reasons, that the district court erred.

A. Outrageousness.

"It is clear that the government may supply drugs to a

suspect in a drug investigation." Hampton, 425 U.S. at 491

(Powell, J., concurring). When this occurs in the prototypical

case, an agent documents a malefactor's acceptance of a

government-supplied sample and then promptly arrests him. In

this scenario, even a large quantity of government-supplied drugs

will not raise judicial eyebrows, for the contraband is regained

coincident with the arrest. See, e.g., Barnett, 989 F.2d at 560

(declining to find outrageous misconduct where agent sold suspect

enough hydriodic acid to manufacture 18 kilos of methamphetamine

9

but recovered it promptly); United States v. Gianni, 678 F.2d

956, 960 (11th Cir.) (similar; agents sold suspect 1150 lbs. of

marijuana but recovered it promptly), cert. denied, 459 U.S. 1071

(1982); United States v. Dunn, 608 F. Supp. 530, 531 (W.D.N.Y.

1985) (similar; agent sold suspect one kilo of cocaine but

recovered it promptly).

The government's role in supplying drugs is more

problematic when the drugs are not recovered. Nonetheless,

several courts have held that providing a known addict small

quantities of drugs in order to facilitate the progress of an

undercover agent's work does not constitute outrageous

misconduct. See United States v. Harris, F.2d , (10th

Cir. 1993) [No. 92-4001, 1993 WL 232155 at *5-*6]; United States

v. Barrera-Moreno, 951 F.2d 1089, 1092 (9th Cir. 1991), cert.

denied, 113 S. Ct. 417 (1992) & 113 S. Ct. 985 (1993); United

States v. Ford, 918 F.2d 1343, 1349-50 (8th Cir. 1990).

Common sense suggests that, where the target of the

investigation is a distributor rather than an addict, the

quantity of drugs needed to earn or retain the suspect's

confidence will likely be larger.7 It is, therefore,

unsurprising that courts generally have declined to find

outrageous misconduct in situations of this sort despite the

7We recognize that narcotics differ in many ways, including
size, weight, and potency; and that, therefore, a small amount of
a particular drug, say, heroin, may be much more lethal than a
larger amount of a different drug, say, marijuana. For ease in
reference, however, we use the term "quantity" throughout this
opinion as a proxy for dangerousness.

10

disappearance of fairly substantial quantities of government

supplied contraband. See, e.g., United States v. Valona, 834

F.2d 1334, 1344-45 (7th Cir. 1987) (declining to find misconduct

where the government disbursed, without recovering, a 3.5-gram

sample of cocaine while negotiating sales aggregating up to 35

kilos); United States v. Buishas, 791 F.2d 1310, 1314 (7th Cir.

1986) (similar; government disbursed, without recovering, a 69-

gram sample of marijuana in the course of closing an 89-kilo

deal).

Although Valona and Buishas are structurally analogous

to the case at hand, the government concedes that the quantity of

drugs given to Fuentes is, in absolute terms, unprecedented. The

question, then, is whether, at some point, the quantity of drugs

disbursed on the government's behalf may become so large that,

given all the attendant circumstances, the government's role

becomes qualitatively different, i.e., outrageous.

The court below devised a seven-part test and, applying

that test, determined the government's actions to be outrageous.

See Santana, 808 F. Supp. at 81-86. The court focused on (1) the

type of drug furnished; (2) the sample's potency or purity; (3)

its relative size; (4) whether the defendant requested it; (5)

whether the drugs were recovered; (6) what likely happened to

them; and (7) whether the sample itself constitutes the corpus

delicti of the crime charged in the indictment.8 Id. at 81-82.

8In contrast, the relevant DEA guidelines, see supra note 1,

suggest consideration of (1) the type and amount of the drug
contained in the sample; (2) the likelihood that the sample will

11

We appreciate the district court's effort to structure the

exercise of judicial discretion, and we realize that the court

did not intend its compendium to be exhaustive. See id. at 82.

Nevertheless, we do not think that the inquiry into

outrageousness can usefully be broken down into a series of

discrete components. Almost by definition, the power of a court

to control prosecutorial excesses through resort to substantive

aspects of the due process clause is called into play only in

idiosyncratic situations and such situations are likely to be

highly ramified. Where facts are critically important and fact

patterns tend to be infinitely diverse, adjudication can often

best proceed on a case-by-case basis. The outrageousness defense

falls into this category. Thus, it is unproductive to force the

determination of outrageousness into a mechanical mode.

Let us be perfectly plain. We find that

outrageousness, by its nature, requires an ad hoc determination.

We do not suggest, however, that the assessment should be wholly

unguided. The calculus must be rooted in the record, and it will

often be informed by the various factors enumerated in the

district court's test, the DEA's test, see supra note 8, and

reach consumers; (3) the number and prominence of the suspects
implicated; (4) the type and amount of evidence needed to
complete the ongoing investigation; (5) the time required to do
so; and (6) the likelihood of obtaining such evidence. Although
the DEA's list, like the district court's list, contains factors
relevant to the seriousness of harm likely to be suffered by end
users, the DEA's list emphasizes, and the court's list slights,
the likelihood that the investigation will lead to the
prosecution of important drug dealers.

12

similar tests produced by other sources.9 At bottom, however,

outrageousness is a concept, not a constant. What shocks the

conscience in a given situation may be acceptable, though perhaps

grim or unpleasant, under a different set of circumstances.

Slashing a person's throat with a sharp knife may be an

unrelievedly outrageous course of conduct if one thinks in terms

of Jack the Ripper, helpless women, and the shadowy streets of

London; the same behavior will be thoroughly acceptable, however,

if the knife is a scalpel, the knife-wielder a skilled surgeon

performing a tracheotomy, the target a patient, and the venue an

operating room. Although we recognize that formulaic tests offer

administrative convenience and ease in application, we also

recognize that neither life nor law can always be made convenient

and easy. So here: there is simply no way to reduce the myriad

combinations of potentially relevant circumstances to a neat list

of weighted factors without losing too much in the translation.

Cf. Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 380 (1st

Cir. 1991) (discussing "outrageousness" in the context of tort

liability and concluding that "[t]here is no universal litmus

9See, e.g., United States v. Feinman, 930 F.2d 495, 498 (6th

Cir. 1991) (suggesting that a reviewing tribunal weigh (1) the
importance of the investigation, evidenced by the type of
criminal activity targeted, (2) whether the criminal enterprise
predated the investigation, (3) whether the investigator directed
or controlled the criminal activity, and (4) the investigation's
impact on the commission of the crime); United States v. Gardner,

658 F. Supp. 1573, 1576-77 (W.D. Pa. 1987) (suggesting that a
reviewing tribunal weigh (1) the government's role in creating
the crime, (2) the illegality or immorality of the police
conduct, (3) the defendant's predisposition to commit the crime,
and (4) whether the investigation is aimed at preventing further
criminality).

13

test that a court can utilize to determine whether behavior is

extreme and outrageous").

In addition to relying on a tightly structured

formulation in an area of the law demanding flexibility, the

district court compounded its error by omitting from that

formulation a salient set of considerations: it disregarded the

nature and scope of the ongoing investigation. The

outrageousness vel non of a police officer's actions can only be

evaluated by taking into account the totality of the relevant

circumstances. When the officer is on the trail of a criminal

enterprise, these circumstances include the identity of the

suspects, the gravity of past crimes, and the dangers foreseeably

attributable to the enterprise's uninterrupted progress

(including likely future crimes). In this instance, the

government had a solid basis to believe that Santana's network

could distribute up to 200 kilograms of heroin per month. Seen

in that light, it does not shock our collective conscience to

think that a lawman would dangle 13.3 grams of heroin as bait to

land such a large-scale ring, even though delivery of the sample

ran a palpable risk of ushering it into the marketplace.

The district judge refused to honor this argument,

which the magistrate described as setting "a big hook to catch a

big fish," for several reasons. We find none of them convincing.

First, the judge worried that the big hook/big fish approach

would remove any outer limit on "the quantity of drugs that the

government can introduce to society." Santana, 808 F. Supp. at

14

83. It is a sufficient answer to this concern that, here, the

size of the sample was proportionate both to the perceived threat

posed by the ongoing criminal activity and to the exigencies of

the chase. Other cases, involving greater quantities of drugs or

materially different circumstances, need not be decided unless

and until they arise.

Second, the judge concluded that "the government's

conduct served only to increase the aggregate sum of heroin

available for consumption." Id. at 84. This statement, which we

read as a bid to repudiate the magistrate's implicit assessment

of costs and benefits, is highly questionable. Let us compare

two worlds. In the first world, the government distributes 13.3

grams of heroin, but Santana's network is put out of business.

In the second world, the government exercises greater restraint

in its undercover activities, but fails to gather enough evidence

to immobilize the ring. The aggregate supply of heroin will be

greater in the first world only if one is prepared to indulge the

unlikely assumption that some other equally skilled criminal

network will instantaneously pick up the slack.

Third, the judge, without saying so in haec verba,

seemingly suggests that some situations cannot be analyzed in

terms of societal costs and benefits. See id. at 85; cf. Richard

C. Donnelly, Judicial Control of Informants, Spies, Stool

Pigeons, and Agents Provocateurs, 60 Yale L.J. 1091, 1111 (1951)

(denouncing "the sinister sophism that the end, when dealing with

known criminals or the 'criminal classes,' justifies the

15

employment of illegal means"). We do not share the district

court's discomfiture with means/ends rationality or what

amounts to the same thing cost/benefit analysis. At least when

the decisionmaker uses a common currency of exchange and operates

under conditions of reasonable certainty, cost/benefit analysis

is a perfectly legitimate mode of legal reasoning, frequently

employed by both courts and agencies. See generally Richard A.

Posner, The Problems of Jurisprudence 105-08 (1990). Using such

an approach here does not strike us as either theoretically

unsound or fundamentally unfair. More important still, we can

identify no constitutional impediment to the government weighing

the risk of an immediate 13.3-gram increase in the heroin supply

against the potential benefit of diverting vast quantities of

heroin from the American market.

The district court's resistance to cost/benefit

analysis is carried to its logical conclusion by appellee

Fuentes. He maintains that no possible prosecutorial objective

can justify the distribution of so much heroin by the government.

But, since there is abundant precedent for distribution of drugs

by law enforcement agents mounting stings and other undercover

operations, see cases cited supra pp. 9-10, the only course of

action compatible with Fuentes's argument would be to construct a

per se rule, drawing a bright line at some particular quantity of

drugs and forbidding lawmen to cross that line in dealing with

suspected drug traffickers. We regard a per se rule in this

16

context as unprecedented, unworkable,10 unwise, and thoroughly

uninviting. We, therefore, refuse to travel that road.

Saying that we reject the district court's objections

to the big hook/big fish metaphor is not tantamount to saying

that we unreservedly embrace the comparison. A hook, regardless

of its size, causes injury only to the fish that is caught. We

think that a more useful metaphor is that it takes a wide net to

catch a big fish. Of course, a net cast to catch a big fish

(thought to be predatory) might also catch hundreds of relatively

innocent little fish. But, if the big fish would have devoured

millions of little fish, even the most tender-hearted marine

biologist would be hard pressed to argue against the fisherman's

use of the net. In the final analysis, probing the magistrate's

metaphor for imprecisions does not assist appellees' cause, but,

rather, reinforces our conviction that the intuition underlying

the metaphor is sound.

We have trolled enough in these waters. We conclude

that, on the facts of this case, the district court erred in

discounting the import of the criminal enterprise's scope and the

magnitude of the threat that it posed. This error possesses

decretory significance: once the size of the sample is measured

in relative rather than absolute terms, the investigation

10We illustrate one of the many problems that such a per se

rule would present. Were we to draw such a line at, say, 10
grams of heroin, we would be handing criminals a foolproof way to
detect whether prospective new suppliers were actually government
agents: simply demand a sample equal to 11 or 12 grams of
heroin.

17

reviewed here is no longer unprecedented and the conduct in

question cannot plausibly be classified as outrageous.11

B. Misconduct Not Injuring Defendants.

Generally speaking, an outrageous misconduct defense

can prosper only if a defendant's due process rights have been

violated. The defense is normally not available in situations

where the government has injured only third parties or committed

a victimless gaffe. We would be compelled to reverse the ruling

below on this basis even if the government's deportment failed

the test of outrageousness.

In an early entrapment case, Justice Brandeis wrote:

"The prosecution should be stopped, not because some right of

th[e] defendant's] has been denied, but in order to protect the

Government. To preserve it from illegal conduct of its officers.

To protect the purity of its courts." Casey v. United States,

276 U.S. 413, 425 (Brandeis, J., dissenting). The obvious

implication of this perspective with its emphasis on the rule

of law rather than on individual rights is that the state ought

not profit by its miscreancy, regardless of whether a charged

defendant has been wronged. Although the doctrinal view of

entrapment based on this philosophy never prevailed, see Russell,

411 U.S. at 428-36, the Second Circuit subsequently flirted with

the same perspective in a different context. In an outrageous

11We do not totally reject the possibility, suggested by the
court below, that outrageous misconduct may be found apart from
situations in which the government has used brutality or induced
commission of a crime. We simply note that the case at hand does
not require us to explore this doctrinal frontier.

18

misconduct case decided on other grounds, Judge Friendly

expressed tentative support, in the abstract, for the view that

the government ought not reap prosecutorial success growing out

of the seeds of misconduct injuring third parties. See United

States v. Archer, 486 F.2d 670, 676-77 (2d Cir. 1973).12 The

court below believed this principle to be applicable here. See

Santana, 808 F. Supp. at 84-85. We do not agree.

In our estimation, the Archer dictum is incompatible

with later pronouncements of the Supreme Court. The flagship

case is United States v. Payner, 447 U.S. 727 (1979). There, the

government obtained evidence against a defendant by rifling a

third party's briefcase. Although no due process claim was

presented on appeal, the Court seized the occasion to address the

precise question of misconduct injuring third parties and adopted

a distinction first endorsed by the Hampton plurality:

[E]ven if we assume that the unlawful
briefcase search was so outrageous as to
offend fundamental "`canons of decency and
fairness,'" Rochin v. California, 342 U.S.

165, 169 (1952) . . . the fact remains that
"[t]he limitations of the Due Process Clause
. . . come into play only when the Government

12Two recent Second Circuit cases cite Archer in connection

with the proposition that courts "will closely examine those
cases in which the Government misconduct injures third parties in
some way." United States v. Thoma, 726 F.2d 1191, 1199 (2d

Cir.), cert. denied, 467 U.S. 1228 (1984); accord United States

v. Chin, 934 F.2d 393, 400 (2d Cir. 1991). But neither panel

actually applied this principle, because no injury to third
parties had been established. By like token, in United States v.

Panet-Collazo, 960 F.2d 256 (1st Cir.), cert. denied, 113 S. Ct.

220 (1992), we were able to sidestep the issue because the heroin
sample provided by the government as part of the sting was not
used in a manner outrageously injurious to third parties. See

id. at 260.

19

activity in question violates some protected
right of the defendant." Hampton v. United

States, supra, at 490 (plurality opinion).

Payner, 447 U.S. at 737 n.9 (1979). This statement, to be sure,

is dictum but it bears the earmarks of deliberative thought

purposefully expressed. The statement is clear, pointed, and

subscribed to by a 6-3 majority of the Justices. It is also

prominent in its placement, appearing, as it does, in the

concluding footnote of a major opinion. What is more, the issue

that footnote 9 addressed had been thoroughly debated in the

recent past, the Payner dissent treated it as purporting to

establish a "standing" limitation, see id. at 749 n.15 (Marshall,

J., dissenting), and the footnote's message has not been diluted

by any subsequent pronouncement. Carefully considered statements

of the Supreme Court, even if technically dictum, must be

accorded great weight and should be treated as authoritative

when, as in this instance, badges of reliability abound. See

McCoy v. Massachusetts Inst. of Technology, 950 F.2d 13, 19 (1st

Cir. 1991) (concluding that "federal appellate courts are bound

by the Supreme Court's considered dicta almost as firmly as by

the Court's outright holdings, particularly when . . . a dictum

is of recent vintage and not enfeebled by any subsequent

statement") (collecting cases to like effect from other

circuits), cert. denied, 112 S. Ct. 1939 (1992); see also Charles

Alan Wright, The Law of the Federal Courts 58, at 374 (4th ed.

1983).

We need not decide whether Payner established a

20

limitation on standing in the strict sense of the word, or merely

signaled that defendants are highly unlikely to prevail when they

seek to vindicate the rights of third parties. In either event,

Payner makes manifest that, here, the trial court lacked

authority under the due process clause to dismiss a charge on the

basis that governmental misconduct caused conscience-shocking

harm to non-defendants. See United States v. Valdovinos-

Valdovinos, 743 F.2d 1436, 1437-38 (9th Cir. 1984) (per curiam)

(rejecting an outrageous misconduct defense on the strength of

footnote 9 in a case in which government agents, trying to trap

professional middlemen, lured illegal immigrants to the U.S. only

to deport them), cert. denied, 469 U.S. 114 (1985); United States

v. Miceli, 774 F. Supp. 760, 770 (W.D.N.Y. 1991) (rejecting an

outrageous misconduct defense on the strength of footnote 9 in a

case in which a government investigator seduced the defendant's

ex-wife in order to gather incriminating information about the

defendant).

IV. SUPERVISORY POWER

The district court grounded its dismissal of count 3 on

its supervisory power as well as on the due process clause. See

Santana, 808 F. Supp. at 86. In a reprise of an argument earlier

advanced, see supra Part III(B), the government asserts that a

federal court's supervisory power does not enable it to curb

misconduct that injures only third parties by dismissing charges

against uninjured defendants. We test this assertion.

The contours of a court's supervisory power are not

21

much in doubt. Under them, a federal court "may, within limits,

formulate procedural rules not specifically required by the

Constitution or the Congress." United States v. Hasting, 461

U.S. 499, 505 (1983). The Hasting Court flagged three underlying

purposes that can justify the use of supervisory power in

response to case-related misconduct, viz.: "to implement a

remedy for violation of recognized rights; to preserve judicial

integrity by ensuring that a conviction rests on appropriate

considerations validly before the jury; and finally, as a remedy

designed to deter illegal conduct." Id. (citations omitted).

While we have expressed the view that courts should be willing to

"consider invoking [their] supervisory powers to secure

enforcement of `better prosecutorial practice and reprimand of

those who fail to observe it,'" United States v. Osorio, 929 F.2d

753, 763 (1st Cir. 1991) (citation omitted), we have repeatedly

cautioned that such powers must be used sparingly, see, e.g.,

id.; United States v. Babb, 807 F.2d 272, 279 (1st Cir. 1986);

United States v. Lieberman, 608 F.2d 889, 899 (1st Cir. 1979),

cert. denied, 444 U.S. 1019 (1980). Potent elixirs should not be

casually dispensed.

We do not believe that the circumstances of this case

warrant such strong medicine. Although resort to a court's

supervisory power has not been foreclosed altogether as a means

to remedy government misconduct not injuring the defendant, the

Supreme Court has plainly semaphored its likely disapproval in

several analogous contexts. For example, the Payner Court

22

concluded that "the supervisory power does not authorize a

federal court to suppress otherwise admissible evidence on the

ground that it was seized unlawfully from a third party not

before the court." Payner, 447 U.S. at 735. In reaching this

conclusion, the Court emphasized that such evidence could not be

suppressed under the Fourth Amendment, see Rakas v. Illinois, 439

U.S. 128, 133-38 (1978), and reasoned that the lower court's

choice of a different analytic framework did nothing to alter the

relative values assigned to the underlying interests. Payner,

447 U.S. at 736. The lesson that this portion of Payner teaches

is that, in a case-specific context, society's interest in

adjudicating guilt and innocence on full information outweighs

its interest in punishing governmental misconduct directed

against third parties.

The Court subsequently held that the supervisory power

could not be invoked to reverse a conviction in order to

castigate the prosecution for misconduct that did not prejudice

(as opposed to injure) the defendant.13 See Hasting, 461 U.S.

at 505. Because the prosecutor's actions in Hasting constituted

harmless error vis-a-vis the defendant, see id. at 507, no relief

was warranted. The holding of Hasting replicates the message

13Misconduct not injuring the defendant is a subset of
harmless error (which itself might be described as misconduct not
prejudicing the defendant). For our purposes, the two categories
may be fruitfully analyzed as one. The only salient difference
between them is that the larger set subsumes not only misconduct
that injures third persons and victimless misconduct, but also
subsumes misconduct that violates a defendant's rights without
affecting the outcome of his case.

23

sent by Payner, but it does so a fortiori: if society's interest

in fully informed adjudication sometimes can outweigh its

interest in protecting the Fifth Amendment rights of defendants,

then surely it can outweigh society's more generalized interest

in making law enforcement officers toe the line.

The reasoning of the Hasting Court is also instructive.

As in Payner, the Court in Hasting reasoned that when courts

exercise the supervisory power, they must respect the balance of

interests struck by conventional application of the legal

doctrines governing the particular problem in the particular

case. See id. at 505. Furthermore, the Hasting Court identified

three justifications, or goals, in service of which the

supervisory power might appropriately be invoked, see id. at 506-

07; see also supra p. 21, and rested its holding in part on an

analysis of them. The Court concluded that none of these three

goals are significantly advanced when the error that is alleged

to constitute misconduct proves harmless, for concerns over

individual rights and the integrity of the judicial process are

less acute in all such cases. See id. at 506. The Court stated

that the third doctrinal goal the deterrence of misconduct14

"is an inappropriate basis for reversal where . . . the

prosecutor's remark is at most an attenuated violation of

[defendant's right to remain silent] and where means more

14We highlight this goal because it not only constitutes the
linchpin of the district court's rationale for employing the
supervisory power in this case, but also serves as the mainstay
of the supporting arguments advanced by the appellees and by the
amici.

24

narrowly tailored to deter objectionable prosecutorial conduct

are available." Id.

Another case delineating limits on the supervisory

power is Bank of Nova Scotia v. United States, 487 U.S. 250

(1988). There, the Court ruled that, "as a general matter, a

district court may not dismiss an indictment for errors in grand

jury proceedings unless such errors prejudiced the defendants."

Id. at 254. In reaching this conclusion, the Court adverted to

Payner's point that value choices dictated by the resolution of

the underlying legal problem should not be affected by the source

from which an inquiring court draws its power. See id. at 255.

The Court also reaffirmed Hasting's point that the rationales for

invoking supervisory power are much weaker in the harmless error

context.15 See id. at 255-56.

In keeping with the Supreme Court's teachings, this

court has repeatedly refused to sanction the deployment of

supervisory power in order to redress harmless error. See

Osorio, 929 F.2d at 763 (finding no nexus between the alleged

misconduct and any prejudice to the defendant); United States v.

Pacheco-Ortiz, 889 F.2d 301, 310 (1st Cir. 1989) (denying relief

when prejudice was not a "product" of alleged misconduct); Babb,

807 F.2d at 272; Lieberman, 608 F.2d at 899; see also United

15It is a short step, sideways rather than forward, from
Hasting to Bank of Nova Scotia. Hasting holds that the

supervisory power may not be used to evade the constitutional
harmless error doctrine of Chapman v. California, 386 U.S. 18

(1957); Bank of Nova Scotia holds that the supervisory power may

not be used to evade the less searching harmless error inquiry
mandated by Fed. R. Crim. P. 52(a).

25

States v. Hastings, 847 F.2d 920, 927 (1st Cir.), cert. denied,

488 U.S. 925 (1988). We think this line of cases adequately

evinces our institutional belief that, taken together, Payner,

Hasting, and Bank of Nova Scotia form a trilogy admonishing

federal courts to refrain from using the supervisory power to

conform executive conduct to judicially preferred norms by

dismissing charges, absent cognizable prejudice to a particular

defendant.16 Accord United States v. Williams, 874 F.2d 968,

976 n.23 (5th Cir. 1989). Here, appellees sustained no

redressable injury attributable to governmental misconduct.

Accordingly, the district court erred as a matter of law when it

invoked supervisory power to dismiss count 3 of the indictment.

Before departing from these shores, we pause to add a

qualification: the use of supervisory power to dismiss an

indictment, in the absence of injury to the defendant, may not be

entirely a dead letter. The Court's reasoning in Hasting may be

read to leave open the possibility that the goal of deterring

future misconduct would justify using the supervisory power to

redress conduct not injuring defendants if the conduct is plainly

improper, indisputably outrageous, and not redressable through

the utilization of less drastic disciplinary tools. See Hasting,

16The Second Circuit has gone even further, reading the
Supreme Court's cases to suggest that "the federal judiciary's
supervisory powers over prosecutorial activities that take place
outside the courthouse is extremely limited, if it exists at
all." United States v. Lau Tung Lam, 714 F.2d 209, 210 (2d

Cir.), cert. denied, 464 U.S. 942 (1983). Because the case at

bar does not require that we probe the ramifications of this
suggestion, we take no view of it.

26

461 U.S. at 506. Be that as it may, we leave the qualification's

fate and dimensions for another day, as this is plainly not such

a case.

V. CONCLUSION

In summary, the orphan doctrine of outrageous

misconduct finds no nurturing home on the facts of this case

because the objects of the government's ongoing investigation

satisfactorily justified whatever harm stemmed from the delivery

(and subsequent loss) of a large heroin sample, and because, in

any event, that harm was not incurred by the appellees

themselves. In like manner, because the trial court

overestimated the reach of its supervisory power in cases of

misconduct not injuring defendants, its alternative rationale

crumbles. If there are exceptions to the general rules that we

have elucidated a matter on which we do not opine they are

assuredly not triggered by this case. Hence, the court lacked a

sufficient legal basis for dismissing count 3 of the indictment.

We need go no further. Although the effect of our

ruling is to uphold the government's tactics in this case, we

remain secure in the knowledge that, despite restrictions

hobbling the outrageous misconduct doctrine, law enforcement

practices are subject to a wide range of specific "constitutional

and statutory limitations and to judicially fashioned rules to

enforce those limitations." Russell, 411 U.S. at 435; cf.

Hasting, 461 U.S. at 506 n.5 (illustrating more narrowly tailored

means to punish prosecutorial misconduct). Moreover, the

27

outrageous misconduct doctrine, no matter how cramped its

confines, is not entirely mummified. Should the occasion and the

necessity arise, we continue to believe that the law will prove

itself adequate to the task of preventing the government from

going too far. In the war on crime, as in conventional warfare,

some tactics simply cannot be tolerated by a civilized society.

Reversed.

28